UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Norfolk Division

DENISE CUFFEE,                    :
                                  :
          Plaintiff,              :
                                  :
v.                                :          No.: 2:15cv35
                                  :
CAROLYN W. COLVIN,                :
Acting Commissioner of            :
Social Security,                  :
                                  :
          Defendant.              :


## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

Plaintiff Denise Cuffee, ("Cuffee") seeks judicial review of the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Title II and Title XVI of the Social Security Act. Specifically, Cuffee claims that the Administrative Law Judge ("ALJ") erroneously failed to adopt a previous finding regarding her residual functional capacity ("RFC"), improperly assessed her credibility, and erred in evaluating the testimony of a Vocational Expert ("VE"). This action was referred to the undersigned United States Magistrate Judge pursuant to the provisions of 28 U.S.C. §§ 636(b)(1)(B) and (C), and Rule 72(b) of the Federal Rules of Civil Procedure. For the reasons stated below, this report recommends that the final decision of the

1

Commissioner be affirmed.

## I.   PROCEDURAL BACKGROUND

Cuffee originally filed an application for DIB and SSI on January 14, 2009 and alleged she was disabled as of September 1, 2008.   (R. 65).   The Commissioner denied her application initially, and upon reconsideration.   (R. 65).   Cuffee then requested an administrative hearing, which ALJ William T. Vest, Jr. held on June 23, 2010. (R. 65).   On July 1, 2010, the ALJ concluded that Cuffee was not disabled within the meaning of the Social Security Act and denied her claim for DIB and SSI.   Id. The Appeals Counsel then denied Cuffee's request for review, (R. 78), thereby making the ALJ's decision the final decision of the Commissioner.   Cuffee did not seek further review of that claim.

At issue in this case, Cuffee filed a second application for DIB on September 19, 2011 and SSI on September 27, 2011, again alleging she was disabled as of September 1, 2008. (R. 172, 175).   Cuffee then amended her onset date to September 26, 2012, one day before her fiftieth birthday.   (R. 23, 32, 42). The Commissioner denied her application initially, (R. 134) and upon reconsideration, (R. 138).   Cuffee then requested an administrative hearing, which ALJ Irving A. Pianin held on October 1, 2013 (R. 39).   On October 16, 2013, the second ALJ again concluded that Cuffee was not disabled within the meaning of the Social Security Act and denied her claim for DIB and SSI.

2

(R. 23). The Appeals Council denied Cuffee's request for review of the ALJ's decision (R. 1), thereby making the ALJ's decision the final decision of the Commissioner. Pursuant to 42 U.S.C. § 405(g), Cuffee filed this action seeking judicial review of the Commissioner's final decision. This case is now before the court on the parties' cross-motions for summary judgment.

## II.  FACTUAL BACKGROUND

In October 2013, when the second ALJ delivered his opinion, Cuffee was fifty-one years old. (R. 23, 32). In the past, she worked as a school bus driver and home cleaner, (R. 223), and in 2012, she obtained her GED. (R.44). Cuffee has not worked since September 1, 2008. Id.

Cuffee's primary medical complaint – pain in her leg – stems from gunshot injuries that occurred on September 1, 2008.[1] (R. 30). Cuffee sustained "bilateral open tibial fractures" from four gunshot wounds and presented to the Sentara Virginia Beach emergency room for treatment and surgery on her legs. (R. 273, 277). Dr. John Williamson performed Cuffee's surgery on September 1, 2008. (R. 277). Upon her discharge from the hospital on September 5, 2008, Cuffee was prescribed Percocet 5/325 for pain management and Plavix for vascular circulation.

---

[1] Because this appeal presents the question of whether the ALJ properly evaluated a previous RFC finding, and because Cuffee has few medical records since that finding, this report will review the entire history of her impairments.

(R. 274).   The discharge report also noted that Cuffee had "an injury to her peroneal nerve," and during her hospital stay she had regained "more sensation on the dorsum of her foot, but still no motor function."  (R. 273).

Cuffee presented to Sentara Orthopaedic Trauma for monthly follow-up appointments from September 2008 to November 2009. (R. 414-21, 448).   On her September 30, 2008 visit, P.A. Christina J. Vitug reported that "[Cuffee] ha[d] very weak dorsiflexion of her ankle and toes," however, "most of her wounds [were] healed."  (R. 421).   P.A. Vitug also provided a referral to physical therapy, which Cuffee began in November 2008.  (R. 305, 421).   In November 2008, Cuffee also visited Progressive Prosthetic & Orthopedic Services to receive a "custom, thermoplastic, articulated ready, solid ankle" to support her ankle during ambulation.  (R. 300).

At her December 2, 2008 appointment with P.A. Vitug, Cuffee reported "achiness" in her fracture sites.  (R. 419).   Cuffee again presented to Progressive Prosthetic & Orthopedic Services on January 23, 2009.   She reported that her pain was 2/10 and she was "very pleased with her progress."  (R. 299).

In addition to monthly follow-up appointments with Sentara Orthopaedic Trauma, Cuffee attended physical therapy from November 2008 to April 2009 to strengthen and rehabilitate her lower legs.  (R. 305).   During this period, Cuffee ambulated

4

with a walker and transitioned to ambulating with a cane by April 2009. (R. 416, 417). At her final physical therapy appointment on April 15, 2009, Cuffee's physical therapists noted that Cuffee "had met all goals with the exception of #8 that was partially met" and discharged Cuffee from physical therapy. (R. 305-06).

In June 2009, nine months after her hospital stay, the surgeon who operated on her gunshot wounds, Dr. John A. Williamson, noted that "on examination [Cuffee] has left foot pain and seems to have left peroneal nerve damage." (R. 414). At this appointment, Cuffee reported "numbness at the outer two toes and numbness at the bottom of her foot," but indicated that she was "really not interested in any more surgery at this time." Id. Dr. Williamson noted that Cuffee had "permanent restrictions because of the weakness of her lower extremity." Id. With regard to Cuffee's work capability, Dr. Williamson reported that he did "not think she needs to be driving a school bus with children on it but, in general no heavy use of her left lower extremity. No long term walking. No ladders. No long term stairs. No balance activities which I think are on a permanent basis." Id.

At her one-year follow-up appointment with Dr. John E. Zallnick at Sentara Orthopaedic Trauma in September 2009, Dr. Zallnick reported that Cuffee continued to experience

"intermittent discomfort at fracture sites with longer periods of activity as expected and ongoing nerve issues of the left lower extremity." (R. 448). He also encouraged her to contact social services regarding job re-training assistance. Id.

Cuffee again saw Dr. Williamson on November 18, 2009, and again on June 15, 2010. (R. 444-47). At her November visit, Dr. Williamson stated that "[s]he does localize pain over her left proximal tibia over two screws," and "I have talked to her about removal of those screws if she so desires." (R. 447). In June 2010, she presented to Dr. Williamson – her last recorded visit with him - complaining of "constant throbbing in her left foot" and bilateral leg pain. (R. 444). Cuffee told Dr. Williamson that she "can't work feeling like this," and she asked for pain medication. Id. Upon examination, Dr. Williamson noted that she had "decreased range of motion and tenderness," but "exhibit[ed] no bony tenderness, normal capillary refill, no deformity, and no laceration." (R. 446). In reviewing x-rays of Cuffee's legs, he also noted that the "hardware [was] intact, good alignment and solid union." Id.

In January 2009, Cuffee filed her first application for disability insurance benefits and supplemental security income. (R. 23). Her application was denied initially, and upon reconsideration. (R. 65). At the administrative hearing on June 23, 2010, the ALJ found Cuffee had the residual functional

6

capacity ("RFC") to perform sedentary work.   (R. 69).   After considering all symptoms and evidence, the ALJ denied Cuffee's application.   (R. 65).   Following the hearing, Cuffee sought review by the Appeals Council. Her request for administrative review was denied, (R. 78), which made the ALJ's decision, the final decision of the Commissioner.

Cuffee did not appeal the first denial, but she filed a second application for DIB and SSI – at issue in this appeal - in September 2011.   (R. 65).   She again alleged an onset date of September 1, 2008, (R. 172, 175), but later amended her onset date to September 26, 2012, (R. 23, 42).   A second ALJ, Irving Pianin, held Cuffee's hearing on October 1, 2013.   (R. 39).   In the period between filing her second application in September 2011 and her hearing in October 2013, Cuffee saw several doctors, mainly for ailments unrelated to her leg pain.[2]

On December 9, 2011 and January 24, 2012, Cuffee presented to the Princess Anne Urgent Care Center, and P.A. Mark A. Fusco examined Cuffee at both visits.   (R. 433, 437).   At her December 9, 2011 visit, Cuffee complained of shoulder pain, shortness of breath, and lightheadedness, and at her January 2012 visit, Cuffee's primary complaint was sinus pain.   Id.

---

[2] Several physicians saw Cuffee in the period between the denial of her first application and her amended onset date of September 26, 2012.   Even though these physicians treated Cuffee outside the dates alleged, their opinions remain relevant because they are the only medical evidence after her original hearing in 2010.

In April 2012, Cuffee presented to Sentara Orthopaedic Trauma[3] requesting pain medication for pain in her legs stemming from the gunshot injuries she sustained in 2008. (R. 440-43). P.A. Emily L. Bosch reported that Cuffee "describe[d] the pain as aching and tingling on her left leg worse than [her] right [leg]" and indicated she had "difficulty with balance." (R. 440). With regard to Cuffee's symptoms and demeanor, P.A. Bosch noted that Cuffee "[did] not use a cane, ... [and did] not do any type of exercises." (R.441). She also reported that Cuffee was "tearful and anxious regarding the fact that the person who shot her was never apprehended." Id.

After examining Cuffee, P.A. Bosch noted that Cuffee's right and left legs showed "no tenderness, normal stability, [and] normal strength and tone." (R. 440, 442). P.A. Bosch also reported that Cuffee's knees had "normal stability [and] normal strength and tone." (R. 442). In addition to a physical examination, P.A. Bosch ordered and interpreted x-rays of Cuffee's legs. Id. For both the left and right tibia, P.A. Bosch found that there was a "healed fracture of the proximal tibia." Id.

On August 11, 2012, Cuffee complained of shoulder pain and presented to Dr. Scott Fowler at the Princess Anne Urgent Care

---

[3] Sentara Orthopaedic Trauma is the same division that oversaw Cuffee's recovery following her gunshot injury.

Center. (R. 472). At this visit, Cuffee also saw radiologist Dr. David M. Cohen who reviewed x-rays of Cuffee's shoulder. Dr. Cohen noted that the x-ray of her shoulder showed a "[n]ormal study" with "[n]o fracture, dislocation or other abnormality seen." (R. 474).

Following lab results from Cuffee's August 11, 2012 visit, Cuffee again saw Dr. Fowler at the Princess Anne Urgent Care Center for a potassium re-check[4] on August 16, 2012. (R. 459). In addition to her potassium re-check, Dr. Fowler performed a musculoskeletal and neurological examination, as well as an examination of her lungs and heart. Id. Dr. Fowler's examination showed that Cuffee had 5/5 strength in her bilateral upper and lower extremities. Id.

Prior to Cuffee's second hearing, at the initial level of administrative review, state agency physician, Dr. Victoria Grady, reviewed the evidence of record and examined Cuffee in December 2011. (R. 427-31). At Dr. Grady's examination, Cuffee complained of pain of 8/10, which over-the-counter medicine reduced to pain of 7/10. (R. 427-28). But Dr. Grady reported that Cuffee had normal range of motion in her right and left knee, hip, and ankle. (R. 432). She also reported that Cuffee did not need a device to ambulate, and concluded that in an

---

[4] Dr. Fowler reported that the prior lab result "was likely lab error as repeat on K [potassium] ... today is normal." (R. 459).

eight-hour workday, Cuffee could stand/walk for six hours and sit for eight hours. (R. 430-31). Dr. Grady also concluded that Cuffee could carry/lift twenty pounds occasionally and could stoop, crouch, and squat. Id.

In January 2012, state agency physician Dr. Carolina Longa also reviewed Cuffee's record and determined that Cuffee could lift/carry up to fifty pounds and frequently lift/carry up to twenty-five pounds. (R. 90). She also concluded that Cuffee had unlimited abilities to push and pull, including operation of foot and hand controls. Id. Dr. Longa reported that Cuffee had "recovered completely" from her previous surgeries with the exception of a "mild limp." (R. 90-91). In April 2012, Dr. Bert Spetzier, another state agency physician, affirmed Dr. Longa's assessment of the record, except that he opined that Cuffee could stand/walk six hours of an eight-hour workday. (R. 114-16).

In conjunction with Cuffee's second application for DIB and SSI, she submitted written responses to supplemental questions regarding her physical and mental capacity in November 2011. (R. 228-35). Cuffee indicated that she did "ironing, laundry, wash[ed] dishes, [and] vacuum[ed] with a light vacuum." (R. 230). Specifically, with the help of her mother, she vacuumed every day for twenty minutes, ironed two times per week for

fifteen minutes, "sometime[s]" washed dishes for twenty-five minutes, and did laundry "twice in two weeks." Id.

Additionally, Cuffee indicated that she went outside "four time[s] in a week" and shopped for groceries "three times in a month ... [for] about two or three hours." Id. She also socialized with friends "on the phone every day" and "at church on Sunday." (R. 232). In response to questions about how her injuries affected her ability to lift, squat, stand, walk, sit, and climb chairs, Cuffee reported that she could "[l]ift 20 or 25 pounds," "walk[] 1/2 or 1 block," "ha[d] to take [her] time [on stairs] and hol[d] on [to] the rail", "[could] not squat[] all the way down because of [her] left leg and foot," but could "stand[] about 25 or 30" and "sit[] about 30" before her leg started to hurt. (R. 235).

At the hearing for her second application on October 1, 2013, Cuffee testified as to her symptoms and work capacity. (R. 41-59). Cuffee testified that she last worked up until the date she was injured, September 1, 2008. (R. 44-45). She also testified that she could stand for about ten to fifteen minutes before her legs started to hurt, and she then would sit for fifteen to twenty minutes before standing again. (R. 48-49). In terms of household chores, Cuffee testified that she does a "little tiny bit" of cleaning and a "little bit" of cooking and dishwashing. (R. 52-53).

11

At the hearing, the ALJ also heard testimony from a vocational expert ("VE"), Edith Edwards. (R. 59-61). Edwards concluded that Cuffee could no longer perform her relevant past work as a bus driver and home cleaner. (R. 60). Additionally, based on Cuffee's physical limitations, the ALJ presented a hypothetical to the VE to determine if jobs existed in the national economy that someone with Cuffee's age, experience, and capacity could perform. (R. 59-61). Edwards concluded that jobs for light, unskilled work, such as an office helper, an information clerk, and a cashier - which such a person could perform - existed in significant numbers in the national economy. (R. 60). In the ALJ's decision, he found that Cuffee had an RFC to perform light work provided she was able to alternate sitting and standing at will. (R. 29).

### III.  <u>STANDARD OF REVIEW</u>

In reviewing a decision of the Commissioner denying benefits, the Court is limited to determining whether the decision was supported by substantial evidence on the record and whether the proper legal standard was applied in evaluating the evidence. 42 U.S.C. § 405(g); <u>Mastro v. Apfel</u>, 270 F.3d 171, 176 (4th Cir. 2001); <u>Hays v. Sullivan</u>, 907 F.2d 1453, 1456 (4th Cir. 1990). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971)

(quoting Consol. Edison Co. of New York v. NLRB, 305 U.S. 197, 229 (1938)). It consists of "more than a mere scintilla" of evidence, but may be somewhat less than a preponderance. Laws v. Celebrezze, 368 F.2d 640, 642 (4th Cir. 1966).

The Court does not undertake to re-weigh conflicting evidence, make credibility determinations, or substitute its judgment for that of the Commissioner. Craig v. Chater, 76 F.3d 585, 589 (4th Cir. 1996); Hays, 907 F.2d at 1456. "Where conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the [Commissioner] (or the [Commissioner's] designate, the ALJ)." Craig, 76 F.3d at 589. The Commissioner's findings as to any fact, if supported by substantial evidence, are conclusive and must be affirmed. Perales, 402 U.S. at 390. Thus, reversing the denial of benefits is appropriate only if either the ALJ's determination is not supported by substantial evidence on the record, or the ALJ made an error of law. Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

## IV. ANALYSIS

To qualify for disability insurance benefits under sections 216(i) and 223 of the Social Security Act, 42 U.S.C. §§ 416(i) and 423, an individual must meet the insured status requirements of these sections, be under the prescribed retirement age, file an application for disability insurance benefits, and be under a

"disability" as defined in the Act.

The Social Security Regulations define "disability" as "the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); see also 42 U.S.C. §§ 423(d)(1)(A) and 416(i)(1)(A). To meet this definition, the claimant must have a "severe impairment" which makes it impossible to do previous work or any other substantial gainful activity that exists in the national economy. 20 C.F.R. § 404.1505(a); see 42 U.S.C. § 423(d)(2)(A).

The regulations promulgated by the Social Security Administration provide that all material facts will be considered in determining whether a claimant has a disability. See 20 C.F.R. § 1520(a)(3). The Commissioner follows a five-step sequential analysis to ascertain whether the claimant is disabled. The ALJ must answer:

1. Is the individual involved in substantial gainful activity?

2. Does the individual suffer from a severe impairment or combination of impairments which significantly limit his or her physical or mental ability to do the work activities?

3. Does the individual suffer from an impairment or impairments which meet or equal those listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1 (a "listed

14

impairment" or "Appendix 1")?

4. Does the individual's impairment or impairments prevent him or her from performing his or her past relevant work?

5. Does the individual's impairment or impairments prevent him or her from performing other jobs existing in significant numbers in the national economy?

20 C.F.R. § 1520(a)(4).

An affirmative answer to question one, or a negative answer to question two or four, results in a determination of no disability. An affirmative answer to question three or five establishes disability. See id. §§ 1520, 416.920. The burden of proof and production rests on the claimant during the first four steps, but shifts to the Commissioner on the fifth step. Pass v. Chater, 65 F.3d 1200, 1203 (4th Cir. 1995) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

When conducting this five-step analysis, the ALJ must consider: (1) the objective medical facts; (2) the diagnoses, and expert medical opinions of the treating and examining physicians; (3) the subjective evidence of pain and disability; and (4) the claimant's educational background, work history, and present age. Hayes v. Gardner, 376 F.2d 517, 520 (4th Cir. 1967) (citing Underwood v. Ribicoff, 298 F.2d 850, 851 (4th Cir. 1962)). At all steps the ALJ bears the ultimate responsibility for weighing the evidence. Hays, 907 F.2d at 1456.

## A.  The ALJ's Decision

As a result of his five-step analysis, the ALJ in Cuffee's second claim concluded that she met the insured status requirements, but had not been under a disability within the meaning of the Social Security Act between Cuffee's alleged onset date, September 26, 2012, and the ALJ's decision, October 16, 2013.  (R. 23, 33).

At step one, the ALJ found that Cuffee had not engaged in substantial gainful activity since her alleged onset date, September 26, 2012.  (R. 27).  At step two, the ALJ found that Cuffee suffered from the following severe impairment: post-surgical repair of bilateral tibial fractures from gunshot wounds to the lower extremities.  Id.  However, at step three, the ALJ found that Cuffee did not suffer from a listed impairment.  (R. 28).  At step four, the ALJ found that Cuffee could not perform her past relevant work because of her impairment.  (R. 32).  In drawing his step four conclusion, the ALJ determined that Cuffee had a residual functional capacity ("RFC") to perform light work, except that Cuffee could only perform work that allowed her to alternate sitting and standing at will.  (R. 29).  At step five, the ALJ concluded there were jobs that existed in significant numbers in the national economy that Cuffee could perform.  (R. 32).

16

In making his RFC determination and his finding of no disability, the ALJ found Cuffee's statements as to the intensity, persistence, and limiting effects of her symptoms to be not entirely credible. (R. 32.). The ALJ gave moderate, but not great weight to the opinions of the Disability Determination Service's ("DDS") medical consultants. Id.

The ALJ also gave only moderate weight to the opinions of Dr. Williamson because more recent medical evidence showed normal strength and no neurological abnormalities, which did not support the restrictions to which he previously opined. Id. The ALJ gave significant and greater weight to the opinions of Dr. Victoria Grady, a state agency physician, because in 2011 – more than a year after Dr. Williamson's last record - she personally observed the claimant's condition, her conclusion was based on objective findings, and the findings were consistent with subsequent physical examinations. Id. Specifically, the ALJ noted that Dr. Grady examined Cuffee in December 2011 pursuant to her second application for DIB and SSI. Even though Dr. Grady's examination occurred before Cuffee amended her onset date to September 26, 2012, Dr. Grady personally assessed Cuffee's leg strength and capacity and made specific findings about her leg injuries.

In her instant appeal, Cuffee advances three arguments urging the Court to reverse or vacate the Commissioner's

17

decision. First, she argues that the residual functional capacity finding is not supported by substantial evidence because the ALJ failed to adopt the residual functional capacity finding from the prior decision and the ALJ did not give adequate weight to the opinion of her treating physician, Dr. Williamson. Second, Cuffee argues that the ALJ did not apply the appropriate legal standards when assessing her credibility. Third, she argues that the step five determination regarding the existence of jobs in significant amount in the national economy - as determined by the vocational expert - is unsupported by substantial evidence. This report considers each of these claims in turn.

**B.  The ALJ's RFC Determination Is Supported by Substantial Evidence.**

Cuffee's principal contentions on appeal are that the ALJ erroneously failed to adopt the previous RFC finding and gave inadequate weight to opinion of the treating physician, Dr. Williamson. (ECF No. 14, at 13); see 20 C.F.R. § 404.1545(a)(1); see also SSR 96-9p, 1996 WL 374185 (S.S.A.) ("RFC is the individual's maximum remaining ability to perform sustained work on a regular and continuing basis.").

When a plaintiff's impairments do not meet or equal a listed impairment under step three of the sequential analysis, the ALJ must then determine the plaintiff's RFC. 20 C.F.R. §

404.1520(e).   After doing so, the ALJ uses that RFC at step four of the sequential analysis to determine whether the plaintiff can perform his past relevant work.   Id. § 404.1545(a)(5)(i). If it is determined that the plaintiff cannot perform past relevant work, the ALJ uses the RFC at step five to determine if the plaintiff can make an adjustment to any other work that exists in the national economy.   Id. § 404.1545(a)(5)(ii).

At the administrative hearing level, the ALJ alone has the responsibility of determining RFC.   Id. § 1546(c).   RFC is determined by considering all the relevant medical and other evidence[5] in the record.   Id. §§ 404.1545(a)(3), 404.1527(b). Relevant evidence includes "information about the individual's symptoms and any 'medical source statements' – i.e., opinions about what the individual can still do despite his or her impairment(s) – submitted by an individual's treating source or other acceptable medical sources."   SSR 96-8p, 1996 WL 374184, at *2 (S.S.A.).   In this case, the ALJ found that Cuffee had the RFC to perform light work with added limitations regarding exposure to heights and hazards, and postural limitations related to her leg pain.

---

[5] "Other evidence" includes statements or reports from the claimant, the claimant's treating or non-treating source, and others about the claimant's medical history, diagnosis, prescribed treatment, daily activities, efforts to work, and any other evidence showing how impairments or symptoms affect the claimant's ability to work.   20 C.F.R. § 404.1529(a).

1.   **The ALJ Properly Decided Not to Adopt Cuffee's Prior RFC.**

Cuffee first contends that the ALJ erred by improperly failing to consider and adopt the RFC finding from her first application. (ECF No. 14, at 13-19). Specifically, Cuffee contends that the ALJ improperly found that her condition improved when he raised her RFC to permit light work, as compared to her first case in which the ALJ found she had the RFC to perform sedentary work. (ECF No. 14, at 14-15).

As the ALJ discussed in his decision, a subsequent disability claim for a "previously unadjudicated period must consider such a prior finding as evidence and give it appropriate weight in light of all relevant facts and circumstances." AR 00-1(4), 2000 WL 43774 (S.S.A Jan. 12, 2000). With regard to the weight given to a prior finding, the following three factors are relevant:

> (1) whether the fact on which the prior finding was based is subject to change with the passage of time, such as a fact relating to the severity of a claimant's medical condition;
>
> (2) the likelihood of such a change, considering the length of time that has elapsed between the period previously adjudicated and the period being adjudicated in the subsequent claim; and
>
> (3) the extent that evidence not considered in the final decision on the prior claim provides a basis for making a different finding with respect to the period being adjudicated in the subsequent claim.

*Id.*

In assessing these factors, the ALJ does not have to separately analyze each one. See *Melvin v. Astrue*, 602 F. Supp. 2d 694, 702 (E.D.N.C. 2009) ("Although the ALJ did not specifically refer to AR 00-1(4) ... or explain the precise weight he gave to the [prior ALJ's findings], the ALJ did *consider* the prior ALJ's findings as part of the reviewing record.") (emphasis in original). Instead, the ALJ can review and evaluate all of the evidence under this standard. See *id;* see also *Nicholson v. Comm'r of Soc. Sec. Admin.*, 600 F. Supp. 2d 740, 749 (N.D. W. Va. 2009).

Furthermore, under Fourth Circuit precedent, later-filed applications are viewed as separate claims "at least to the extent that the most recent application alleges a previously unadjudicated period of disability." *Albright v. Comm'r of Soc. Sec. Admin.*, 174 F.3d 473, 476 (4th Cir. 1999). The passage of time also plays a role in the weight given to prior applications and their corresponding RFC determinations. A prior RFC would be "highly probative" of a continuing condition for a period of a few weeks, but would be less probative after a longer period of time. *Id.* at 477 ("Although we might state with some assurance that a claimant's condition very likely remains unchanged within a discrete two-week period, we would grow ever less confident as the timeframe expands. Where, as here, the

21

relevant period exceeds three years, our swagger becomes barely discernible.") (discussing Rucker v. Chater, 92 F.3d 492, 495 (7th Cir. 1996); Lively v. Sec'y of HHS, 820 F.2d 1391 (4th Cir. 1987)).

Cuffee argues that prior agency decisions "should carry considerable weight." (ECF No. 14, at 13) (quoting Albright, 174 F.3d at 478). But she concedes that "a prior RFC finding need not be sustained, [ ] when the agency 'produc[es] substantial evidence of improvement in [a claimant's] condition.' ''  Id. (quoting Albright, 174 F.3d at 477). She also asserts that her impairments - peroneal nerve damage and left lower extremity weakness - are of a permanent nature and have not improved over time.  Id. at 15.  Furthermore, Cuffee argues that the ALJ improperly relied on Dr. Fowler's August 2012 examination because he only performed a "cursory examination" of musculoskeletal strength because the primary purpose of the visit was to check Cuffee's potassium levels. Id.

Again, review in this Court is limited to the question of whether the ALJ correctly applied the law and supported his decision with substantial evidence.  Coffman, 829 F.2d at 517. The answer to both of these questions is yes.

First, the ALJ directly discussed the above factors from AR 00-1(4).  (R. 24).  He stated that he gave "significant weight

to the findings of the prior hearing decision with the exception of the finding related to the claimant's residual functional capacity." Id. In Cuffee's case, her claims are separated by three years, and a three-year span between the adjudication of claims is one of the relevant factors under AR 00-1(4). Furthermore, the ALJ noted that "the current evidence supports a less restrictive residual capacity based on improvement in the claimant's condition and an increase in her physical abilities." Id. Specifically, the ALJ noted that no objective evidence supported reduced strength in Cuffee's lower extremities "that would prevent her from lifting up to 20 pounds occasionally and 10 pounds frequently." (R. 25).

Besides the documented treatment she received for her gunshot injuries, which concluded in 2010, Cuffee submitted few additional records. These additional records included medical visits post-2010 for shoulder pain, sinus pain, and one visit for leg pain. That is not to say that Cuffee has not been able to seek treatment since her first hearing date. She presented for treatment at least five times. However, Cuffee complained of leg pain at only one of these doctor visits.

At one of her post-2010 medical visits, Cuffee presented to Dr. Fowler at the urgent care center, where she complained of shoulder pain. (R. 472). He again saw her on August 16, 2012 because of an abnormal lab result from her August 11 visit. (R.

23

459).   In  addition  to  checking  the  abnormal  lab  result  –  the
potassium  re-check  –  Dr.  Fowler  also  performed  a  musculoskeletal
and  neurological  examination,  as  well  as  an  examination  of  her
lungs  and  heart.   Id.   As  a  result  of  his  examination,  Dr.
Fowler  reported  that  Cuffee  had  5/5  strength  in  her  bilateral
upper  and  lower  extremities.   Id.

The  ALJ  also  discussed  the  weight  he  gave  to  examinations
conducted  by  state  agency  doctors.   The  ALJ  gave  significant  and
greater  weight  to  the  examination  and  conclusions  of  state
agency  physician  Dr.  Victoria  Grady,  who  examined  Cuffee  in
December  2011.   (R.  430-32).   Dr.  Grady  performed  a  strength
examination  and  reported  that  Cuffee  had  normal  range  of  motion
in  her  right  and  left  knee,  hip,  and  ankle.   (R.  432).   She  also
reported  that  Cuffee  did  not  need  a  device  to  ambulate,  and
concluded  that  in  an  eight-hour  workday,  Cuffee  could  stand/walk
for  six  hours  and  sit  for  eight  hours.   (R.  430-31).   The
evidence,  as  presented  in  Dr.  Grady's  medical  reports,  and
corroborated  by  the  record  from  Dr.  Fowler,  represents
substantial  evidence  of  Cuffee's  improved  condition.   Dr.  Grady
specifically  assessed  Cuffee's  capability  in  light  of  her  leg
injuries  and  found  that  her  condition  had  improved,  and  Dr.
Fowler's  observations  in  2012  were  entirely  consistent  with  Dr.
Grady's  findings.

24

Based on his thorough review of the record, taking into account such factors as the passage of time and the improvement documented in the medical evidence, the ALJ determined that Cuffee's RFC had changed.   The undersigned finds the ALJ's decision not to adopt the prior RFC to be supported by substantial evidence and a correct application of AR 00-1(4).

**2.   The ALJ Correctly Weighed Dr. Williamson's Opinion.**

Cuffee next argues that the ALJ failed to give proper weight to Dr. Williamson's opinions when determining Cuffee's RFC.   Determining whether a claimant is disabled is the sole responsibility of the Commissioner, and opinions on this issue are not entitled to special significance.   20 C.F.R. § 404.1527(d).   In determining a claimant's RFC and thus, whether she is disabled, the ALJ must consider the objective medical evidence in the record, including the medical opinions of the treating physicians and the non-examining medical consultants. In assigning weight to any medical opinion, the ALJ must consider: (1) "[l]ength of treatment relationship;" (2) "[n]ature and extent of treatment relationship;" (3) degree of "supporting explanations for their opinions;" (4) consistency with the record; and (5) the specialization of the physician. Id. § 404.1527(c).

Generally, the opinion of a treating physician is given more weight than that of a non-treating or non-examining medical

source.  Id. § 404.1527(c)(2).  A treating physician's opinion merits "controlling weight" if the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  Id. § 404.1527(c)(2). Conversely, "if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight." Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996).  In such a case, "the ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001) (citing Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992)).

Because the regulations require the ALJ to evaluate every medical opinion, if the ALJ determines that a treating physician's opinion is not entitled to controlling weight, it is "still entitled to deference and must be weighed using all of the factors provided in [the regulations]." SSR 96-2P, 1996 WL 374188, at *5 (S.S.A.); see also 20 C.F.R. § 404.1527(c).  When the ALJ determines that the treating physician's opinion should not be given controlling weight, the ALJ must articulate "good reasons" for his decision.  20 C.F.R. § 404.1527(c)(2).

"Because State agency medical and psychological consultants and other program physicians and psychologists are experts in the Social Security disability programs," the ALJ is also required to consider their factual determinations about the "nature and severity of an individual's impairment(s) as opinions of nonexamining physicians and psychologists." SSR 96-6p.  While the ALJ is not bound by these findings, "they may not ignore these opinions and must explain the weight given to the opinions in their decisions." Id.  The opinion of a non-examining, non-treating physician, in turn, can be relied upon when the opinion is consistent with the record.  Gordon v. Schweiker, 725 F.2d 231, 235 (4th Cir. 1984).  Additionally, "[w]hen the record contains a number of different medical opinions, including those from the Plaintiff's treating physician(s), consultative examiners or other sources that are consistent with each other, then the ALJ makes a determination based on that evidence." Armentrout v. Astrue, 3:10CV504, 2011 WL 4625931, at *4 (E.D. Va. June 2, 2011), report and recommendation adopted, 3:10CV504, 2011 WL 4625912 (E.D. Va. Oct. 3, 2011).

Cuffee argues that the medical records relied on by the ALJ are insufficient to demonstrate medical improvement.  She argues that the ALJ ignored medical records that indicate her condition did not improve, and instead focused only on the medical records

27

that supported the ALJ's determination. However, Cuffee's argument misconstrues the available medical records. The medical record regarding her leg pain is very limited because after Cuffee's first application for DIB and SSI she mainly sought medical treatment for ailments other than those related to her leg injuries. Cuffee primarily relies on the opinion of Dr. Williamson - who oversaw Cuffee's monthly follow-up visits to Sentara Orthopaedic Trauma - to support her argument that her condition has not improved. However, at the time of the second hearing, the medical records from Dr. Williamson were more than three years old, with her last visit in the record dated June 15, 2010. (R. 444-46).

In making his determination, the ALJ properly addressed and assigned weight to the documented opinions offered by the various doctors, as presented in Cuffee's records. First, the ALJ discussed the weight assigned to the opinions offered by Dr. Williamson from Sentara Orthopaedic Trauma. Specifically, the ALJ gave "only moderate weight to the opinions of Dr. Williamson" because more recent evidence showed normal strength and no neurological abnormalities to support his original restrictions on Cuffee's capabilities. (R. 32). Cuffee last saw Dr. Williamson in 2010, two years before the alleged onset date at issue in this appeal. In the intervening time since 2010, Cuffee presented to other doctors, including state agency

physician Dr. Victoria Grady, P.A. Emily L. Bosch with Sentara Orthopaedic Trauma, and P.A. Mark A. Fusco and Dr. Scott Fowler at the urgent care center. These doctors' medical records provide more recent evidence as to Cuffee's condition and uniformly suggest that her leg pain would not limit her to sedentary work.

Specifically, both Dr. Grady and P.A. Bosch saw Cuffee for examination of her leg injuries. Dr. Grady, a state agency physician, specifically assessed Cuffee's leg strength and capability. She determined that Cuffee had "normal range of motion" in her legs, knees, and ankles. (R. 432). P.A. Bosch, a treating provider, examined Cuffee in April 2012 after Cuffee complained of leg pain. After an examination, P.A. Bosch determined that Cuffee's legs showed "no tenderness, normal stability, [and] normal strength and tone." (R. 440, 442). Additionally, P.A. Bosch reviewed x-rays of Cuffee's legs and reported that there were "healed fracture[s] of the proximal tibia." (R. 442). Both of these doctors saw Cuffee for assessment of her legs, and both reported improvement in Cuffee's leg capacity.

Due to the improvement of Cuffee's condition - as documented by the medical evidence in her record - the undersigned finds no error in the weight assigned to Dr. Williamson's opinions.

C.  **The ALJ's Assessment of Cuffee's Credibility Did Not Undermine Substantial Evidence Review.**

Cuffee's second contention is that the ALJ "failed to apply the appropriate legal standards" when assessing her credibility and statements regarding her symptoms.  (ECF No. 14, at 25).  Cuffee argues that the ALJ did not "articulate specific and articulable reasons for discrediting [Cuffee's] testimony as is required."  Id. at 26 (citing Hammond v. Heckler, 765 F.2d 424, 426 (4th Cir. 1985)).  The ALJ's decision though makes it clear that he assessed Cuffee's subjective testimony, as well as the objective medical evidence regarding Cuffee's symptoms, and he discussed the specific evidence he relied on to assess her credibility.

In deciding whether a plaintiff is disabled, the ALJ must consider all symptoms, including pain, and the extent to which such symptoms can reasonably be accepted as consistent with the objective evidence. 20 C.F.R. § 404.1529(a).  A plaintiff's subjective statements about pain or other symptoms alone are not enough to establish disability.  Id.  As the ALJ pointed out in his decision, determining whether a person is disabled by pain or other symptoms is a two-step process.  (R. 29).  First, the plaintiff must satisfy a threshold obligation of showing by objective medical evidence a medical impairment reasonably likely to cause the symptoms claimed. 20 C.F.R. § 404.1529(b);

30

Craig, 76 F.3d at 594-95.  "[W]hile a claimant must show by objective evidence the existence of an underlying impairment that could cause the pain alleged, 'there need not be objective evidence of the pain itself.' "  Craig, 76 F.3d at 592-93 (quoting Foster v. Heckler, 780 F.2d 1125, 1129 (4th Cir. 1986)).

After the plaintiff has satisfied the first step, the ALJ must evaluate the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work.  20 C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ must consider "all the available evidence," including: (1) the plaintiff's history, including her own statements, id.; (2) objective medical evidence, which is defined as "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion, muscle spasm, sensory deficit or motor disruption," id. § 404.1529(c)(2); and (3) other evidence submitted by the plaintiff relevant to the severity of the impairment such as evidence of daily activities, medical treatments and medications, and descriptions of the pain or other symptoms, id. § 404.1529(c)(3).

In evaluating the intensity and persistence of the plaintiff's symptoms and the extent to which they affect her ability to work, the ALJ must consider whether inconsistencies

31

exist and the extent to which there is conflict between the plaintiff's statements and the other evidence. Id. § 404.1529(c)(4). According to the regulations, a plaintiff's "symptoms, including pain, will be determined to diminish [her] capacity for basic work activities to the extent that [her] alleged functional limitations and restrictions due to symptoms, such as pain, can reasonably be accepted as consistent with the objective medical evidence and other evidence." Id.

As to the first step, the ALJ found that the symptoms Cuffee reported could relate to an objectively established medically determinable impairment. (R. 29). With regard to step two, the ALJ must discuss specific evidence informing his determination to only partially credit her description of these symptoms. See Hammond, 765 F.2d at 426. In this case, the ALJ's decision meets this requirement. In his step two analysis, the ALJ first stated that Cuffee's own statements, and those of her mother and sister, regarding the "intensity, persistence and limiting effects of these symptoms are not entirely credible" and "the record does not support the degree of limitation [Cuffee] alleges." (R. 29).

In reaching this conclusion, the ALJ considered the entire record and documented his review in detail in the opinion. Specifically, with regard to Cuffee's symptoms, the ALJ noted that Cuffee testified to persistent pain that interrupted her

concentration and prevented her from performing a desk job. (R. 29, 49-50). The ALJ also noted that Cuffee reported using a cane to ambulate in the past, but stopped using the cane because she thought she "could take control of [her] balance and pain;" however she could not remember when she stopped using the cane. (R. 29, 50). Cuffee also stated that "[she] realized [she] should be back on the cane again because [she] fell down twice." (R. 50).

In addition to Cuffee's testimony, the ALJ discussed the written responses that Cuffee submitted with her second application for DIB and SSI. In her written responses, Cuffee indicated that, with the help of her mother, she vacuumed every day for twenty minutes, ironed two times per week for fifteen minutes, "sometime[s]" washed dishes for twenty-five minutes, and did laundry "twice in two weeks." (R. 230). She also indicated that she went outside "four time[s] in a week," shopped for groceries "three times in a month ... [for] about two or three hours," and socialized with friends "on the phone every day" and "at church on Sunday." (R. 232).

Also relevant to the ALJ's determination were two letters, each dated September 30, 2013, sent by Cuffee's sister, Michelle Harris, (R. 263), and her mother, Rosetta Albitton, (R. 264-65). (R. 30). Both letters detailed Cuffee's pain, inability to walk

for long periods, and continued fear stemming from the violent nature of Cuffee's original injury. (R. 30, 263-65).

The ALJ also detailed the treatment Cuffee sought and received following her gunshot wounds in September 2008: As of May 27, 2009, Cuffee reported a 2/10 pain level. In June 2009, Dr. Williamson reported that Cuffee may have left peroneal nerve damage, however, Dr. Williamson noted that Cuffee did not need additional physical therapy. (R. 30-32). On December 30, 2011, Cuffee presented to state agency physician Dr. Victoria Grady. Dr. Grady concluded that Cuffee retained the capacity to stand and/or walk about six hours in an eight-hour workday; sit eight hours in an eight-hour workday; carry and/or lift twenty pounds occasionally, and bend, stoop, crouch, and squat occasionally. (R. 31, 427-31). Furthermore, Dr. Grady reported that Cuffee had 5/5 strength in her upper extremities, 4/5 strength for dorsiflexion and plantar flexion bilaterally, and 5/5 strength in her hamstrings, quadriceps, iliopsoas, and calves bilaterally. (R. 430).

The ALJ categorized the above medical evidence as "conservative treatment" for Cuffee's lower leg pain, and found that Cuffee's and her relative's descriptions of the restrictions on her daily activities were "out of proportion" to the findings of the examinations and medical treatment. (R. 31). The ALJ made it clear that he evaluated Cuffee's condition

34

using Cuffee's subjective complaints of pain, her relatives'
written testimony about Cuffee's symptoms, and the objective
medical evidence.

To the extent Cuffee contends that the ALJ erred in
evaluating her credibility, the Court must give great deference
to the ALJ's credibility determinations. Eldeco, Inc. v. NLRB,
132 F.3d 1007, 1011 (4th Cir. 1997). "When factual findings
rest upon credibility determinations, they should be accepted by
the reviewing court absent 'exceptional circumstances.' " Id.
(quoting NLRB v. Air Products & Chemicals, Inc., 717 F.2d 141,
145 (4th Cir. 1983)). "Exceptional circumstances" are those
where the ALJ's determination is "unreasonable, contradicts
other findings of fact, or is based on an inadequate reason or
no reason at all." Id.

Here, the ALJ concluded that Cuffee's impairments could
reasonably be expected to cause some of the alleged symptoms,
but her statements concerning the intensity, persistence, and
limiting effects of those symptoms were "not entirely credible."
(R. 31-32). As noted above, the ALJ provided specific examples
from the record that supported his articulated reasoning.
Additionally, the ALJ accommodated all of the physical
impairments produced by Cuffee's lower leg injury and pain in a
restrictive RFC that provided for alternating sitting and
standing at will and limited kneeling, crouching, crawling, and

stooping. (R. 29). As a result of the detailed objective medical evidence and subjective evidence cited by the ALJ in his decision, the undersigned finds the ALJ's analysis of Cuffee's credibility to be supported by substantial evidence.

**D.  The Vocational Expert's Finding Was Proper, and the ALJ's Step Five Finding Was Supported by Substantial Evidence.**

Cuffee's final argument relates to the limitations described in the ALJ's hypothetical to the Vocational Expert ("VE"), and the ALJ's determination at step five. In reaching his decision that Cuffee was capable of performing work in the national economy, the ALJ relied on the VE's testimony in response to a hypothetical question. When relying on VE testimony based on hypothetical questions, the hypotheticals posed must account for all of the claimant's limitations as shown by the record. Walker v. Bowen, 889 F.2d 47, 50-51 (4th Cir. 1989). If limitations are omitted, the VE's testimony is of limited value, and may not constitute substantial evidence. See Johnson v. Barnhart, 434 F.3d 650, 659 (4th Cir. 2005) (citing Walker, 889 F.2d at 50). Failing to consider limitations shown by the evidence, and then relying upon the errant hypothetical to form an opinion about the availability of work suitable to the claimant is error. Hancock v. Barnhart, 206 F. Supp. 2d 757, 767 (W.D. Va. 2002).

Cuffee claims that the ALJ erred by concluding that she could perform light work. (ECF No. 14, at 27-28). She argues that if her own testimony about her limitations were credited and the relevant restrictions included in the hypothetical, she could not perform any of the positions identified by the VE. On examining the VE, the ALJ first asked her to characterize Cuffee's past work as a bus driver, which she characterized as medium, semi-skilled work, and Cuffee's past work as a home cleaner, which she characterized as light, unskilled work. (R. 59).

Next, the ALJ crafted a hypothetical including Cuffee's age, education, past experience, and the limitations he later imposed in his RFC. This hypothetical was based on Cuffee's testimony and the objective medical evidence presented in the record. In response to this hypothetical, the VE offered three light, unskilled positions that such an individual could perform: office helper at the light level with 68,750 nationally, information clerk with 59,000 nationally, and cashier with 46,875 nationally. (R. 59-60). The ALJ also asked if any job would allow an individual to sit, lie down, and stand in order to relieve pain with the frequency described in Cuffee's testimony; the VE testified that no position would accommodate these restrictions. (R. 60). Based on the VE's response, at step five, the ALJ concluded that jobs existed in

37

significant numbers in the national economy, which someone, such as Cuffee, could perform.

The ALJ's RFC and hypothetical adequately reflect the limitations he imposed, and those limitations sufficiently accommodate Cuffee's impairments, as presented by the medical evidence and testimony. The only evidence suggesting Cuffee would require more substantial restrictions came from Cuffee's own testimony, and as set forth above, the ALJ explained the reasons why he gave different weight to Cuffee's testimony and the various doctors' reports. The evidence credited by the ALJ constitutes substantial evidence to support the hypothetical as presented, and accordingly, the undersigned finds no error of law in the ALJ's use of the VE's testimony.

## V. RECOMMENDATION

For the foregoing reasons, the Court recommends that the Court DENY Cuffee's Motion for Summary Judgment (ECF No. 14), GRANT the Commissioner's Motion for Summary Judgment (ECF No. 15), and AFFIRM the final decision of the Commissioner.

## VI. REVIEW PROCEDURE

By copy of this Report and Recommendation, the parties are notified that pursuant to 28 U.S.C. § 636(b)(1)(C):

1. Any party may serve upon the other party and file with the Clerk written objections to the foregoing findings and recommendations within fourteen (14) days from the date of

mailing of this Report to the objecting party, 28 U.S.C. § 636(b)(1)(C), computed pursuant to Rule 6(a) of the Federal Rules of Civil Procedure. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.

2. A district judge shall make a _de novo_ determination of those portions of this report or specified findings or recommendations to which objection is made.

The parties are further notified that failure to file timely objections to the findings and recommendations set forth above will result in waiver of right to appeal from a judgment of this Court based on such findings and recommendations. Thomas v. Arn, 474 U.S. 140 (1985); Carr v. Hutto, 737 F.2d 433 (4th Cir. 1984); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984).

/s/
Douglas E. Miller
United States Magistrate Judge

DOUGLAS E. MILLER
UNITED STATES MAGISTRATE JUDGE

Norfolk, Virginia
September 18, 2015